# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6138 | **DATE** | September 3, 2002 |
| **CASE TITLE** | Panos v. Foley & Lardner | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment (doc. #16-1)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendant's motion for summary judgment (#16-1) is **GRANTED**. All pending dates and motions are terminated as moot. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | **SEP 0 4 2002** |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| JHC | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number: 27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 0 4 2002

CHRISTINE I. PANOS,

Plaintiff,

v.

FOLEY & LARDNER,

Defendant.

NO. 00 C 6138

JUDGE WILLIAM J. HIBBLER

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Panos ("Panos") filed this action against her former employer, Foley & Lardner ("Foley"), alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Foley employed Panos as a legal secretary from January 1999 until August 2000 when she voluntarily left the firm to attend law school. Panos claims she was sexually harassed by an associate attorney she worked for, Paul Beattie ("Beattie"), and in retaliation for complaining about Beattie's behavior, Foley transferred her to a less desirable assignment. Foley now moves for summary judgment, contending Panos has neither established an actionable sexual harassment claim, nor identified an adverse employment action to support her retaliation claim. For the following reasons, Foley's motion for summary judgment is **granted.**

## BACKGROUND

In September 1998, Panos interviewed with Patti Starr ("Starr"), Foley's personnel director, and Beattie, an associate attorney in the Intellectual Property department, for a position as a legal secretary. Panos claims that during the course of the interview, Beattie made several inappropriate comments, such as, "I want us to be close friends"; I want you to be more than my secretary"; "Are you dating anyone seriously?"; Are you single?"; and "I want to make sure you don't have a husband and children to rush home to." Foley subsequently offered Panos the job, but she declined, citing the fact that she was



currently working for her pregnant sister, a lawyer in a small domestic law relations firm, and did not want to abandon her. Panos did not mention Beattie's comments. Eventually Panos told Beattie she could start at Foley in January. Prior to her January start date, Beattie called Panos at home on several occasions to express his continued interest in having her as his legal secretary. Panos claims Beattie once asked if they could get together, which she interpreted as an invitation for a date. Although Panos says this statement made her uncomfortable, she did not, at that time, mention this incident to anyone at Foley.

On January 4, 1999, Panos began working for Foley as a legal secretary assigned to Beattie and another associate attorney in the IP department, Greg Gardella ("Gardella"). Foley had a formal written sexual harassment policy when Panos commenced her employment that explained what it considered to be sexual harassment and how complaints of such conduct would be handled. All "attorneys, administrators, and staff members" were encouraged to report violations of the policy to Foley's "Managing Partner, the Partner-in-Charge of the office, the Office Administrator, or other individual who may be designated… [to receive such complaints]." (Foley & Lardner's Exs. in Supp. of its Mot. for Summ. J., Ex. E). Both Panos and Beattie signed a form acknowledging receipt of Foley's sexual harassment policy.

Nevertheless, Panos maintains Beattie engaged in sexually harassing conduct over the next ten months which she did not formally report to Foley because she was unaware that it was actionable sexual harassment. Panos claims Beattie told her during a lunch in January or February 1999 that he could not promise faithfulness to his wife, and mentioned that it was acceptable in Europe for bosses and secretaries to have affairs. Foley dismisses those statements as "water cooler type" comments made in the context of the Clinton/Lewinsky affair. Panos also claims that several months later when Beattie took her out to dinner, he asked about her dating life, and then told her he advocated purely sexual relationships. In addition to the verbal comments, Panos claims that approximately twice a month, Beattie would lean over her to fix or add something to the document she was typing, causing his body to brush up against hers,

and at least once a week in the afternoon, he would place his hands on her shoulders and ask if she was tense. Panos admits she did not ask Beattie to stop touching her, but would simply "scoot away" to avoid him. Finally, Panos complains Beattie regularly readjusted his genital area in front of everyone, including her. Gardella also testified that Beattie once used the gesture in an expletive manner in reference to opposing counsel. Most of the staff laughed and joked about what they considered an offensive act. Beattie testified that he unconsciously adjusted his crotch to relieve discomfort caused by an injury he suffered while in the Marines.

Panos says Beattie's behavior made her uncomfortable, but because she was unsure about what constituted an inappropriate conversation between a boss and secretary, she gave him the benefit of the doubt. Panos does point out, though, that she talked to Annette McGarry ("McGarry"), special counsel in Foley's IP Department with whom Panos was friendly, about Beattie's comments, mentioned to Sharon Barner, a Foley partner, Beattie's disgusting habit of touching himself, and told Gardella that Beattie was obsessed with her. Panos nonetheless admits that those discussions consisted of general conversation with other Foley employees, as opposed to attempts to report sexual harassment pursuant to Foley's written policy. Indeed, McGarry testified that Panos never did anything more than joke with her about Beattie's behavior. Likewise, in his deposition testimony, Gardella denied having any conversations with Panos of a sexual nature involving Beattie, stating Panos mostly vented about how Beattie was a difficult person to work with.

In any event, notwithstanding Panos's alleged discomfort, she and Beattie worked together without incident until October 12, 1999. Up until that time, Panos testified, Beattie had never yelled at her or made her feel physically unsafe. However, on that particular day, Beattie berated her for being unable to create a Table of Authorities for a brief due to be filed by the end of the day. According to Panos, Beattie yelled an obscenity, that "she had f------ up his brief.," and kicked a file cabinet. Panos did not go to work on October 13, 1999. When she returned on October 14, Beattie called her into his office,

and continued to yell and swear at her about the events of October 12. Panos left Beattie's office in tears, and proceeded directly to Starr's office, accompanied by another secretary, Vickie Hinshaw ("Hinshaw"), to complain about his conduct. The parties agree Panos recounted to Starr all that had transpired with Beattie on October 12 and 14 concerning their work-related dispute. However, Panos maintains she also informed Starr about the uncomfortable and inappropriate incidents involving Beattie and herself, conveying that Beattie was being sexually persistent. Panos concedes, though, that during her meeting with Starr she never used the words "sexual harassment." Starr, in contrast, insists Panos never mentioned anything about sexually offensive comments or touching by Beattie, and points to the fact that her contemporaneous handwritten notes of the October 14 meeting do not reflect a report of sexual misconduct. Hinshaw, who was present at the meeting, testified at her deposition that Starr did take notes most of the time, and that she recalled Panos complaining about Beattie standing in her personal space.

After hearing what had transpired, Starr told her they should bring the matter to the attention of Doug Boyd ("Boyd"), Foley's office administrator. Shortly thereafter, Boyd called Beattie and Panos to his office. Both Starr and Boyd were sympathetic to Panos's complaint about Beattie. Boyd reprimanded Beattie, telling him in no uncertain terms that his behavior was unacceptable. Starr and Boyd then offered Panos a transfer of assignment, which she declined. Beattie, however, expressed a desire that Panos be reassigned. But once Boyd reminded Beattie that Panos was a good secretary, Beattie agreed to continue to work with her. Boyd advised Panos to call him if she experienced any other problems with Beattie.

Unfortunately, after that meeting, the professional relationship between Panos and Beattie deteriorated. Beattie began to monitor Panos's attendance and report to Boyd hat she was frequently tardy. Approximately two weeks later, Panos complained to Starr that because she felt Beattie had not let go of his anger concerning the brief incident, and he was out for revenge, she wanted a transfer. Starr and Boyd indicated they would transfer her as soon as they could arrange another assignment. But in the

-4-

meantime, they requested that Panos continue working for Beattie during November, as he was on vacation and Panos was familiar with his clients. Panos agreed to stay. Once Beattie returned from vacation (around Thanksgiving), Starr and Boyd reassigned Panos to a paralegal in the IP Department, and she continued her assignment with Gardella. Panos admits she was not subjected to any further sexually harassing conduct by Beattie after October 12, 1999. However, she contends Beattie began to retaliate against her for complaining about his behavior by making mocking statements, standing close, questioning her about Gardella's work, blocking her exit from the kitchen, and intentionally bumping into her while exiting the elevator. In February 2000, Panos complained to Starr again about Beattie. Consequently, Foley management explicitly warned Beattie to stay away from Panos.

On March 10, 2000, Beattie announced his formal resignation from Foley, effective April 7, 2000, as he had accepted a position at a law firm in Washington State. Shortly after Beattie's departure, Panos filed an EEOC charge, alleging sexual harassment and retaliation. Panos contends Beattie continued to harass her after she complained about his conduct in October, and Foley did nothing to stop him. Panos also maintains that the November 1999 transfer to a paralegal gave her less visibility and chance for advancement. Her only support for this contention is the statement of another secretary that a paralegal's recommendation carried less weight than an attorney's. However, Boyd and Starr both testified that salary and "visibility" are determined not by assignment, but by performance. In addition, Panos believes a negative evaluation submitted by Beattie in January 2000 was used against her. But Boyd insists he did not consider Beattie's comments at all, as evidenced by the "slightly exceeds expectations" rating Panos received, and the corresponding raise. In August 2000, Panos quit her job at Foley and began law school.

## STANDARD OF REVIEW

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts and inferences are viewed in the light most

favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the use of self-serving assertions, without factual support in the record, will not defeat a motion for summary judgment. *James v. Sheahan*, 137 F.3d 1003, 1006 (7th Cir. 1998). Instead, the party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Indeed, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there can be no genuine issue as to any material fact. *Celotex*, 477 U.S. at 322-23.

## ANALYSIS

### I. Sexual Harassment

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001), quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986). To prevail on her sexual harassment claim here, Panos must show, first of all, that the harassment was based on her sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Indeed, the record must demonstrate that the hostility was motivated by gender, rather than a personal dislike, grudge, or workplace dispute. *Berry*, 260 F.3d at 808 ("Inappropriate conduct that is inflicted regardless of sex is outside [Title VII's] ambit.") (citation and internal quotation omitted); *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996).

In addition to being gender-motivated, this harassment must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998), quoting *Meritor Savings Bank*, 477 U.S. at 67. The resultant "hostile work environment" must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787

(citation omitted). The Seventh Circuit has explained that although "[t]he concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women . . . it is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l*, 50 F.3d 428, 430 (7th Cir. 1995). Indeed, Title VII does not prohibit all verbal or physical harassment in the workplace." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). Accordingly, "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment," *id.*, nor will "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers, " *Baskerville*, 50 F.3d at 430. Furthermore, "the alleged discriminatory conduct cannot be considered in a vacuum; rather, an employee's claim must be evaluated in light of the social context in which events occurred." *Hilt-Dyson*, 282 F.3d at 463.

### 1. *Hostile Work Environment*

Panos argues that Beattie's comments during the recruitment process, lunch, dinner, and his physical acts of brushing against her and touching her shoulder collectively created a hostile and abusive work environment. Foley first contends Panos's claims are time-barred in part because certain conduct occurred prior to 300 days before she filed her EEOC charge on April 10, 2000. The Seventh Circuit has reiterated the Supreme Court's admonition not to interpret statutes of limitations in a grudging, hostile fashion. *Galloway*, 78 F.3d at 1165. Particularly, when sexual harassment is alleged, courts must consider the importance of the cumulative process, as often this harassment may not be diagnosable as sex discrimination in its early stages or may not have "cross[ed] the threshold that separates the nonactionable from the actionable." *Id.* at 1166. The Supreme Court recently affirmed this reasoning, holding that a racially based hostile work environment claim will not be time-barred if all acts constituting the claim are part of the same unlawful practice and at least one falls within the filing period. *Nat'l Railroad Passenger Corp. v. Morgan*, 121 S.Ct. 2061, 2065-66 (2002).

Here, Panos alleges all of Beattie's behavior is part of the same unlawful practice, beginning with

his inappropriate questions concerning her personal life and culminating in his physical invasion of her personal space at work. Thus the Court does not believe Panos's claims are time-barred. *Id.* at 2074 ("The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

The critical issue the Court must now decide is whether Panos has come forward with enough evidence such that a reasonable jury would find Beattie's objectionable conduct so severe that it created a hostile work environment for her. Subjectively speaking, the record is clear that after the October blow-up, Panos perceived her work environment as hostile and abusive. She testified to a marked change in her personality, and an intense fear of physical harm by Beattie. What is not as apparent, though, is whether Panos held the same belief prior to the brief incident. Panos states she thought Beattie's conduct inappropriate, but not sexually intimidating. Indeed, Panos maintains she was not aware until October 1999, that Beattie's prior conduct was sexual harassment. Consequently, the Court is not fully persuaded Panos has demonstrated a subjective perception of a hostile work environment at the time the alleged sexual misconduct occurred. *See Hilt-Dyson*, 282 F.3d at 463 (subjective component established where plaintiff testified she felt violated after a supervisor touched her back twice and found those incidents demeaning and degrading). Nevertheless, because the Court on summary judgment must draw all reasonable inferences in favor of the nonmoving party, it will presume that Panos did indeed experience some subjective level of discomfort as a result of Beattie's sexual behavior.

However, regardless of that subjective belief, the Court does not believe an objective person would view Panos's work environment as hostile or abusive. While Beattie's questions about her personal life and comments suggesting he desired a personal relationship with her were certainly inappropriate, his

statements were relatively innocuous. Sexually charged conduct should be evaluated in terms of its frequency, severity, whether it was physically threatening or humiliating or just an offensive utterance, and whether it unreasonably interfered with work performance. *Faragher*, 524 U.S. at 787-88. True, Panos was unfortunately placed in the awkward position of having to discuss her personal life with her boss. But she points to, at most, five or six discussions of this nature over a year long period of time. "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville*, 50 F.3d at 431. Additionally, Beattie did not use any obscenities or threaten adverse action against Panos if she refused his advances. Thus, his comments are more akin to the "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers that generally does not create a work environment that a reasonable person would find intolerable." *Hilt-Dyson*, 282 F.3d at 463 (internal quotation and citation omitted).

Furthermore, there is no evidence that Beattie's adjusting of his genital area, a habit both attorneys and support staff at Foley found offensive, was directed at women only or intended to convey any sexual connotations. McGarry testified Beattie behaved like that anywhere, and around both men and women. Gardella likewise mentioned Beattie made the gesture in front of him when speaking of another attorney. Panos therefore has failed to show that Beattie's touching of his genital area was "motivated by general hostility to the presence of women in the workplace." *Oncale*, 523 U.S. at 80. *See also Berry*, 260 F.3d at 808 ("an employer cannot be held liable for creating or condoning a hostile work environment unless the hostility is motivated by gender"); *Galloway*, 78 F.3d at 1168 (finding the epithet "bitch" was not inherently sexual).

Finally, even when Beattie's alleged physical contact with Panos is considered in conjunction with the other incidents, Panos still has not demonstrated the kind of extreme conduct amounting to a change in the terms and conditions of employment. *See Faragher*, 524 U.S. at 788. Again, the Court recognizes that a boss placing his hands on an employee's shoulders as if to offer a massage, or deliberately brushing

against a subordinate's body, constitutes inappropriate workplace behavior. However, "[t]here are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor. . . . . A hand on the shoulder, a brief hug, or a peck on the cheek lie at the end of the spectrum. . . . When the harassment moves beyond the sort of casual contact which (if it were consensual) might be expected between friendly co-workers, and manifests in more intimate, intrusive forms of contact, it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).

What Panos has described consists of little more than casual physical contact. For instance, when Beattie touched her shoulders, or stood too close for comfort, Panos immediately moved away. Because those incidents, as in *Hilt-Dyson*, were "brief and involved no threats, intimidation or humiliation," 282 F.3d at 463 (supervisor rubbed plaintiff's back on two occasions), and unlike *Hostetler*, did not involve acts of a "physical, intimate and forcible character," 218 F.3d at 809 (co-worker forced his tongue into plaintiff's mouth and later cornered her and attempted to unfasten her bra), Beattie's conduct does not appear to be severe enough to reach the level of actionable sexual harassment. However, Panos also alleges a significant frequency over a ten month period, with the shoulder rubbing occurring at least once a week, and the body contact twice a month. "The added weight of repetition over time or cumulation with other acts of harassment" could cause a reasonable person to conclude that repeated casual contact has become serious enough to alter the plaintiff's work environment. *Hostetler*, 218 F.3d at 808.

Whether that is the case here is a close question. Concerning the body contact, when considered in the context in which it occurred, the Court does not believe a reasonable juror would find it severe or pervasive. In the process of leaning over her to type, Beattie's body touched Panos's. That is not an unusual occurrence for a boss who relies on his secretary to prepare documents for him. Indeed, the October brief blow-up was precipitated in part by Panos's inability to perform a word processing function on her computer. Furthermore, Panos immediately moved out of Beattie's way to allow him complete

access to whatever document he sought to correct. Thus, although the Court is mindful that it must draw all reasonable inferences in favor of Panos on summary judgment, the evidence here simply does not suggest that twice a month Beattie manufactured a reason to rub his body against Panos. As such, his actions cannot be "characterized as an effort to demean her on account of her sex." *Hilt-Dyson*, 282 F.3d at 464.

Moreover, although the weekly shoulder rubs present an even closer call than the body contact, the fact that Panos never objected to Beattie's touch, and in fact, quickly moved away to avoid him, causes this Court to conclude a reasonable juror would not find that conduct serious or extreme enough to convert Panos's work environment into a hostile one. Indeed, the Court finds it telling that not a single witness here, McGarry, Gardella, or Hinshaw, ever saw Beattie touch Panos in an offensive way, even though they all worked in relatively close proximity in Foley's IP Department. Furthermore, Panos herself admitted she never felt physically threatened by Beattie until the October blow-up, and throughout the ten months of inappropriate conversations and touching, Beattie's behavior never adversely impacted her work performance.

Taking all those factors into consideration, the Court concludes Panos has not met her burden of demonstrating the existence of a genuine issue of material fact on her hostile work environment claim. The evidence here is simply insufficient to show Beattie created the type of hostile and pervasive sexually objectionable work environment prohibited by Title VII. Accordingly, Panos has failed to establish an actionable sexual harassment claim.

### 2. *Employer Defense to Liability*

Even if Panos had proven her work environment was hostile, liability under Title VII is not automatically imputed to Foley. In *Faragher* and *Ellerth*, the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at

765; *Faragher*, 524 U.S. at 807. However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages," consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.*

First, the parties dispute Beattie's status, with Foley contending he was not Panos's supervisor for Title VII purposes because associate attorneys had no authority to hire, fire, promote or otherwise affect a secretary's employment. Although Title VII does not expressly define the term "supervisor," the Seventh Circuit has stated "the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998). In describing the extent of Beattie's authority, Panos points out that he impacted the hiring decision, his review affected her salary, and he could recommend her termination. Whether those circumstances were sufficient to deem Beattie a supervisor is not an issue the Court need decide, though, since it is clear that even if he is, Foley can successfully invoke the *Faragher/Ellerth* defense to liability.

By promulgating a written sexual harassment policy (which Panos acknowledged receiving), that described in layman's terms what conduct was considered unacceptable, and set forth a complaint procedure, Foley satisfied its initial burden under the defense. *Ellerth*, 524 U.S. at 765. If the evidence shows Panos unreasonably failed to use the complaint procedure provided by Foley, then Foley will have demonstrated the second element of the defense as well. *Id.* Panos contends her pre-October 1999 conversations with McGarry, Gardella, and Sharon Barner about Beattie's inappropriate behavior, and October 1999 discussion with Starr about Beattie being sexually persistent, should be treated as complaints of sexual harassment sufficient to impute notice to Foley. For Panos to withstand summary judgment, she must present evidence that she gave Foley enough information to make it think there was some probability that she was being sexually harassed. *Zimmerman v. Cook County Sheriff's Dep't.*, 96 F.3d 1017,

1019 (7th Cir. 1996).

Panos clearly fails this test as it relates to her general comments to her McGarry, Gardella and Barner. Panos concedes she never mentioned the term "sexual harassment" to them, and that she was speaking in passing, about Beattie and the problems she encountered in working for him, not registering a formal complaint of sexual harassment pursuant to Foley's policy. Panos admits that prior to October she did not find Beattie's conduct sexually harassing. Thus, it is disingenuous for her to now suggest McGarry, Gardella and Barner should have inferred from their general conversations that she was being harassed by Beattie and reported his behavior to Foley management.

As for the October meeting with Starr, there is some question as to what information was conveyed. The three individuals present each offer a different story, with Panos saying she told Starr about all the prior inappropriate conversations and described Beattie as "sexually persistent," Starr countering Panos never mentioned anything of the sort, and Hinshaw recalling Panos complaining about Beattie invading her personal space. Assuming Panos's version of the facts is correct, as the Court must on summary judgment, Foley maintains it took prompt action that was reasonably calculated to end the harassment and prevent the conduct from reoccurring. *Ellerth*, 524 U.S. at 765; *Berry*, 260 F.3d at 813. The Court agrees.

Panos admits all sexually harassing behavior by Beattie ended after Starr and Boyd and reprimanded Beattie on October 14, 1999. Furthermore, Panos was immediately offered the opportunity to be reassigned from Beattie, but she voluntarily chose to remain as his legal secretary, even though he had asked that she be transferred. Once Panos concluded the assignment with Beattie would no longer work, and reported her feelings to Starr, it was only a matter of weeks before she was transferred. And, even though Panos continued to work for Beattie while she awaited a new assignment, he was not present in the office during that time.

Panos nonetheless believes Foley should have done more, such as threaten Beattie with

termination, or place a write-up in his personnel file. But in light of the fact that Foley's strong response apparently caused Beattie to cease engaging in sexual misconduct, there is no real dispute concerning Foley's effectiveness in responding to Panos's complaint. *See Berry*, 260 F.3d at 813 (rejecting argument that employer who took action to stop inappropriate sexual behavior should have taken more aggressive measures). Panos has presented no evidence that Foley's efforts to rectify her complaint were not reasonably likely to end Beattie's behavior. Consequently, the *Faragher/Ellerth* defense to liability applies here, and Foley is entitled to summary judgment even if Beattie's conduct amounted to actionable sexual harassment.

## II. Retaliation

Next Panos contends Foley transferred her to a position with less visibility and chance for advancement in retaliation for her complaints about Beattie. Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing," under the statute. *See* 42 U.S.C. 2000e-3(a). To succeed on her retaliation claim, Panos must establish a prima facie case of retaliatory intent by showing, among other things, that she suffered some adverse employment action. *Stone v. City of Indianapolis Pub. Utils.* Div., 281 F.3d 640, 644 (7th Cir. 2002). For an adverse employment action to be actionable, there must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Negative performance reviews, a change in job title, or an increased travel distance to work, standing alone, do not qualify. *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001) . However, the Seventh Circuit has emphasized that an adverse employment action need not be quantifiable in terms of pay or benefits. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

Panos argues that the reassignment, which the Court notes she requested, negatively impacted her

-14-

career at Foley. However, a transfer of duties involving no reduction in pay and no more than a minor change in working conditions does not constitute adverse action. *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996). Panos maintained the same job responsibilities as a legal secretary in Foley's IP Department, only she worked for a paralegal and attorney, as opposed to two attorneys. Panos nonetheless contends other secretaries told her working for a paralegal limited her opportunities for advancement. But Panos cannot rely on inadmissible hearsay testimony to refute the testimony of Boyd and Starr that her salary and visibility were based on her performance, and not solely who she worked for. *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000) ("a hearsay statement made during a deposition does not constitute adequate evidentiary support for a factual proposition.") Absent some concrete evidence (which Panos has not presented here) that Foley deliberately denied her career opportunities, Panos's transfer does not rise to the level of an adverse employment action. *See Crosson v. Caremark, Inc.*, 01 C 6468, 2002 WL 1769937, at *5 (N.D.Ill. July 30, 2002). *See also Patt v. Family Health System, Inc.*, 280 F.3d 749, 753 (7th Cir. 2002) (finding no adverse action where plaintiff failed to point to specific evidence showing how her employer limited her career opportunities). Indeed, Panos has identified no future opportunities that would have been available to her had she been assigned to work for another associate attorney.

Panos further asserts the "continuing" harassment by Beattie that she endured after the transfer constitutes an adverse employment action.[1] Panos claims Beattie mocked her, prevented her from leaving the kitchen, and intentionally bumped into her as he was exiting the elevator. "Retaliatory harassment by co-workers or a supervisor can rise to this level [of an adverse action that materially alters the terms

---

[1] The post-October 12, 1999 incidents of workplace "harassment" are clearly not actionable as sexual harassment under Title VII, because Panos has presented no evidence suggesting Beattie was motivated by gender. Panos concedes Beattie's conduct was not sexual in nature, and does not offer anything demonstrating Beattie retaliated against her because of her sex, rather than a desire to punish her for complaining to Starr about the brief incident. *See Berry*, 260 F.3d at 809.

-15-

and conditions of employment] if it is severe enough to cause a significant change in the plaintiff's employment status." *Stutler*, 263 F.3d at 703. Beattie's behavior, while childish, is "too petty and tepid to constitute a material change in the terms and conditions of [Panos's] employment." *Id.* at 704. Panos alleges no material harm whatsoever that resulted to her from his conduct. Indeed, Boyd testified that he disregarded Beattie's negative evaluation of Panos. That Panos received a "slightly exceeds expectations" rating and corresponding raise is proof Panos's employment was not actually affected by Beattie's behavior in any tangible way. Because Panos has failed establish the existence of an adverse employment action, her retaliation claim fails. *See Smart*, 89 F.3d at 440 ("a plaintiff proceedings under the *McDonnell Douglas* burden-shifting method must first establish a prima facie case of retaliation"). Consequently, Foley is also entitled to summary judgment on that claim as well.

## CONCLUSION

The Court grants Foley's motion for summary judgment.

**IT IS SO ORDERED.**

WILLIAM J. HIBBLER, DISTRICT JUDGE

DATED: September 3, 2002